**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**

DELILA PACHECO, )
)
Petitioner, )
)
v. )        **Case No. CIV-16-450-RAW-KEW**
)
ABOUTANAA EL HABTI, Warden, )
)
Respondent. )

## OPINION AND ORDER

Now before the court is Petitioner's petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 [Doc. 1]. Petitioner, a *pro se* prisoner in the custody of the Oklahoma Department of Corrections, is currently incarcerated at the Mabel Bassett Correctional Center in McLoud, Oklahoma. Following a jury trial, she was convicted of one count of first-degree child-abuse murder (Okla. Stat. tit. 21, § 701.7(C)) in Cherokee County District Court Case No. CF-2013-535 and was sentenced to life imprisonment with the possibility of parole. She is attacking her conviction and sets forth the following grounds for relief:

    I.     The State's evidence was insufficient to prove all of the essential elements of first-degree child-abuse murder and therefore, Petitioner was convicted and sentenced in violation of her rights to due process under the Fifth and Fourteenth Amendments.

    II.    Petitioner was deprived of the effective assistance of counsel in violation of the Sixth and Fourteenth Amendments because counsel failed to provide a qualified interpreter and failed to object to improper comments made by the State.

Respondent concedes the petition is timely and that Petitioner has exhausted her state court remedies for the purpose of federal habeas corpus review. [Doc. 9 at 2].[1] The grounds for relief

---

[1]    This court's record citations refer to the CM/ECF page numbers in the upper right-hand corner of each document.

asserted by Petitioner herein were presented to the Oklahoma Court of Criminal Appeals (OCCA). The following have also been submitted to the court for consideration in this matter:

A.      Petitioner's direct appeal brief.

B.      Notice of extra-record evidence and application for evidentiary hearing.

C.      State's brief in Petitioner's direct appeal.

D.      Petitioner's appellate reply brief.

E.      Summary Opinion affirming Petitioner's judgment and sentence.

F.      State court record.

G.      Transcripts.

H.      Trial exhibits.

**Standard of Review**

Under the Antiterrorism and Effective Death Penalty Act, federal habeas corpus relief is proper only when the state court adjudication of a claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

**Factual Background**

In December of 2013, two young foster children, A.H. and H.H., were living with Petitioner, Petitioner's husband ("Mr. Pacheco"), and the couple's teenage children ("F.P.," "Fl.P.," and "J.P.") in Cherokee County, Oklahoma. [Doc. 10-2 at 58, 109-112, 191-93, 202-03, 218-21; Doc. 10-3 at 8-11]. Petitioner was the main caregiver and disciplinarian for A.H., a two-

year-old, and H.H., a three-year-old, since Mr. Pacheco was usually at work.  [Doc. 10-2 at 221, 223-24, 226; Doc. 10-3 at 11].  The foster children were Petitioner's relatives.  [Doc. 10-2 at 58].

On December 7, 2013, the day before A.H.'s death, Petitioner, Mr. Pacheco, F.P., and J.P. went to Vinita, Oklahoma, to purchase a new vehicle for F.P.  [Doc. 10-2 at 148-49, 194, 204, 229; Doc. 10-3 at 13].  A.H. and H.H. stayed home with Fl.P.  [Doc. 10-2 at 204, 228; Doc. 10-3 at 13].  When Petitioner and her family members left for Vinita, A.H. appeared normal, there were no bruises on her, and she did not appear to be hurting.  [Doc. 10-2 at 228; Doc. 10-3 at 25].  Because A.H. was potty training, Fl.P. took A.H. to the bathroom every twenty to thirty minutes, and never noticed any bumps, bruises, or cuts.  [Doc. 10-2 at 205].

The family returned home from Vinita around 7:00 or 8:00 p.m.  [Doc. 10-2 at 150, 230; Doc. 10-3 at 14].  By that time, A.H. was lying in the place where she slept, on a pallet on the floor of Petitioner's bedroom, next to the side of the bed where Petitioner slept.  [Doc. 10-2 at 148-51, 155, 193-95, 230, 232; Doc. 10-3 at 14-18].  Petitioner told Investigator Casey Baker of the Cherokee County Sheriff's Department that when they arrived home from Vinita, A.H. was crying, so she changed her diaper, but she did not observe any bruises on her.  [Doc. 10-2 at 150].  Mr. Pacheco and Petitioner then left the residence to pick up hamburgers for dinner from a nearby casino.  [Doc. 10-2 at 150-51, 205-06; Doc. 10-3 at 14-15].  Petitioner and Mr. Pacheco were gone for about an hour, and when they came home there was nothing wrong with A.H. and she had no bruises.  [Doc. 10-2 at 206-08, 230-31; Doc. 10-3 at 14-15].

Mr. Pacheco went to bed around 11:00 or 11:30 p.m., and A.H. was on her pallet but still awake and talking to herself.  [Doc. 10-3 at 18-19].  Petitioner told Deputies Dexter Scott and Charlie Dreadfulwater that A.H. did not want to go to sleep and was awake for much of the night, gagging herself in an effort to stay awake.  [Doc. 10-2 at 58, 87-88].  This resulted in Petitioner being awake for much of the night as well.  [Doc. 10-2 at 157-58; Doc. 10-3 at 22].  Petitioner told Investigator Baker that A.H. woke up approximately every hour gagging herself, and except for when the noise woke up F.P. and Mr. Pacheco around 4:00 a.m., Petitioner was the only individual awake with A.H.  [Doc. 10-2 at 157-59].

Mr. Pacheco testified that he woke up at some point around 3:30 a.m., when Petitioner turned on the television and told A.H. to go to sleep. [Doc. 10-3 at 20, 32]. Mr. Pacheco was lying on his back, but then turned on his side toward the closet, so he did not see A.H. or Petitioner. *Id.* at 32-33. During the night, Mr. Pacheco heard Petitioner spank A.H. two or three times and heard A.H. say "[o]wie." *Id.* at 20-21. Mr. Pacheco believed that A.H. said "owie" in conjunction with Petitioner spanking her. *Id.* at 36.

Petitioner told Deputy Scott and Investigator Baker that the last time she was awakened by A.H. was around 5:00 or 5:30 a.m., when A.H. was talking and still not wanting to go to sleep. [Doc. 10-2 at 58-60, 158-59]. Petitioner and Mr. Pacheco both stated that Mr. Pacheco was still asleep at the time. *Id.* at 159. Investigator Baker specifically asked if it was possible that anyone else was in the room during the night, and Petitioner responded with a "no." *Id.* at 168. The only people in the bedroom were A.H., Mr. Pacheco, and Petitioner. *Id.*

Petitioner reportedly woke up at approximately 10:00 a.m. on December 8, 2013, and went outside to smoke a cigarette. *Id.* at 160. When Petitioner went back inside the house, she found A.H. lying lifeless on the floor and she thought, "Oh, my God. What did I do?" *Id.*

A call came in to the 911 office at 10:54 a.m., and emergency personnel arrived at the residence at 11:05 a.m. *Id.* at 46. Paramedic Kyle Murphy noticed that A.H.'s body was pale and cold, she was not breathing, and she did not have a pulse. *Id.* at 22. Resuscitation efforts were terminated when emergency personnel determined rigor had set in and A.H. was pronounced dead at 11:10 a.m. *Id.* at 23-24, 26, 46, 49-50. The paramedic noticed bruising on the face, mouth, back, leg, and buttocks of A.H.'s body. *Id.* at 33-36. Others at the scene, including the investigator, two deputies, and a child welfare worker, also testified about the extent of the bruising. Id. at 78, 82-83, 111, 146-47.

Dr. Andrea Wiens, from the Office of the Chief Medical Examiner, performed an autopsy on A.H. [Doc. 10-3 at 75, 79-80]. In her external examination of A.H., Dr. Wiens observed forty individual bruises or abrasions related to blunt force injury on A.H.'s body, including nineteen bruises on her torso, seven on her arms and legs, four on her right cheek, three on her scalp, two on her forehead, two scrapes on her chin and two abrasions on her tongue. *Id.* at 82-88. Though

Dr. Wiens admitted A.H. could have caused some of the bruises herself by being a normal stumbling toddler, the bruises on the soft part of the body, such as on the buttocks, were indicative of inflicted injuries. [Doc. 10-3 at 89-90; Doc. 10-5 at 3-8].

Dr. Wiens also performed the internal examination on the child, and she found blood in A.H.'s belly cavity. *Id*. at 92. A.H.'s liver had a large laceration, which the doctor described as "a tearing of the tissue due to the amount of force that sort of rips it apart," causing a collection of blood underneath the liver capsule. *Id*. at 92-93, 95. Approximately forty percent (40%) of the blood in A.H.'s entire body, about 240 milliliters, was in her abdominal cavity. *Id*. at 95-96. This amount of internal bleeding results in cardiovascular shock and death. *Id*. at 96.

A liver laceration, according to Dr. Wiens, "occurs with a hard, fast impact." *Id*. For example, the doctor explained that a liver laceration might result from a high speed, motor vehicle crash where a driver impacts the steering wheel. *Id*. In the case at hand, the location of the tear to A.H.'s liver was on the back side of the liver, which indicated that the impact came from A.H.'s front, causing her liver to hit the spine, fold around the spine, and then be ripped by the spine. *Id*. at 96-97. The injury on the back of the child's liver indicated that, at the time of the impact, A.H. was in a position in which her back was supported and the spine did not move. *Id*. at 104-05. A.H.'s injury was consistent with a stomping, kicking or punching to her abdominal area. *Id*. at 105-06. The doctor further opined that the injury was "not likely" caused by a person simply stepping on the child, explaining that "[t]here probably would not be enough force generated in a quick enough time frame to cause an injury like this." *Id*. at 106. When asked if she believed the injury could have been caused by a four-year-old, the doctor testified "no," and that it was "not likely." *Id*. at 108-09, 122.

Dr. Wiens testified that A.H. would have suffered abdominal pain before her death, and that her ability to verbalize that pain would depend on how long she was conscious after the injury. *Id*. at 107. Dr. Wiens opined that, depending on how fast A.H. was bleeding from the liver, the child could have been conscious from just a few minutes to maybe two to three hours at the most. *Id*. at 107-08, 120. The doctor acknowledged that the time of injury is unknown, but also opined that the time of death "would have been within minutes to hours prior to EMS arriving at the scene, based on the fact that [A.H.] had rigor mortis changes when emergency medical services were

there," noting "[r]igor mortis takes time to develop, thirty minutes, an hour, and it stays strong for several hours." *Id*. at 120-21.

Mr. Pacheco, F.P., Fl.P., and J.P. told investigators and testified during the trial that they did not inflict the injuries to A.H. [Doc. 10-2 at 195-97, 208-09, 242-43; Doc. 10-3 at 22-23, 25-26]. In addition, Petitioner told the investigator that the injuries to A.H. were not caused by Mr. Pacheco, or a stranger, and that Petitioner and Mr. Pacheco were the only ones in the room with A.H. during the night. [Doc. 10-2 at 167-68]. Petitioner maintained that she did not injure the child. When asked if it was possible that Petitioner hit or kicked A.H., Petitioner said she didn't think so, and that she did not know, but that "it's possible" since she was a "wild sleeper." *Id*. at 160, 167.


**Ground I: The State's evidence was insufficient to prove all of the essential elements of first-degree child-abuse murder and therefore, Petitioner was convicted and sentenced in violation of her rights to due process under the Fifth and Fourteenth Amendments.**

Petitioner relies heavily upon Dr. Wien's testimony regarding the child's estimated time of death, insisting that she was asleep when the child was injured. [Doc. 1 at 5-6]. Petitioner identifies the first two elements of Oklahoma's first-degree child-abuse murder, acknowledging that the "defense did not contest that the victim was under the age of eighteen or that the death resulted from the willful or malicious using of unreasonable force." *Id*. at 6. Nevertheless, Petitioner "contests the third element," claiming the State did not prove the child's death was caused by Petitioner. *Id*. Unlike prior statements made during the investigation, Petitioner now points the finger at Mr. Pacheco and others present in the home during the time of A.H.'s injury, contending that the "only conclusive factor is that someone is responsible for the death of the child." *Id*. Petitioner argues that "anyone in the home could have been responsible for the death of the victim," and that she "is the only one excluded by the evidence." *Id*. at 7. Ultimately, she concludes that "[t]he evidence was insufficient to support the death was caused by the [Petitioner] and does not support a finding of guilt in this case[,] requiring a reversal." *Id*.

In response, Respondent argues that the OCCA's determination was not contrary to, or an unreasonable application of, federal law as determined by the Supreme Court, and that Petitioner is not entitled to relief. [Doc. 9 at 7]. In short, Respondent contends that the OCCA reviewed Petitioner's claim on the merits and applied the correct standard in deciding the sufficiency claim on direct review, which according to Respondent, is "identical" to the standard in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Id*. at 15 n. 1. Respondent also sets forth the following argument for denying Petitioner's claim:

> The Tenth Circuit recognizes the *Jackson* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Valdez v. Bravo,* 373 F.3d 1093, 1096-1097 (10th Cir. 2004). As this Court is reviewing this case on collateral review, it is not "allowed to 'weigh conflicting evidence or consider the credibility of witnesses.'" *Matthews*, 577 F.3d at 1184 (quoting *Valdez*, 373 F.3d at 1097). "Rather, when 'faced with a record of historical facts that supports conflicting inferences [the court] must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution.'" *Matthews*, 577 F.3d at 1184 (quoting *Messer v. Roberts*, 74 F.3d 1009, 1013 (10th Cir. 1996)). As shown, the Oklahoma Court of Criminal Appeals' decision in this case was reasonable and thus, this Court may not "weigh conflicting evidence or consider the credibility of witnesses, but must accept the jury's resolution of the evidence." *Valdez,* 373 F.3d at 1097.

*Id*. at 15-16.

The OCCA addressed Petitioner's claim as follows:

> In Proposition I, Appellant complains because there was no direct evidence that she inflicted the victim's fatal injury, willfully or otherwise. Jurors are entitled to make reasonable inferences from the attendant facts. Given the nature of the fatal injury, the considerable external bruising, and the undisputed fact that the child was in Appellant's care during the night, a rational juror could conclude, beyond any reasonable doubt, that Appellant inflicted the injuries and that they were not accidental in nature. *Day v. State*, 2013 OK CR 8, ¶ 13, 303 P.3d 291, 298; *Drew v. State*, 1989 OK CR 1, ¶¶ 2-9, 771 P.2d 224, 226-27. The evidence, while largely circumstantial, is sufficient to support Appellant's conviction. Proposition I is therefore denied.

*Pacheco v. State*, No. F-2014-1029, slip op. at 2-3 (Okla. Crim. App. Apr. 15, 2016) (unpublished) (footnote omitted). [Doc. 9-5]. The OCCA also made the following observation: "The autopsy showed that the victim's liver was lacerated by being pressed against the spine. The Medical

Examiner testified that this fatal injury was consistent with having been firmly punched, kicked, or stomped while lying against a firm surface, such as a floor." *Id*. at 3 n. 1.

In federal habeas review of a state court conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). The Supreme Court repeatedly has emphasized the deference the reviewing court owes to the trier of fact and "the sharply limited nature of constitutional sufficiency review." *Wright v. West*, 505 U.S. 277, 296 (1992) (citing *Jackson*, 443 U.S. at 319). "[A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume--even if it does not affirmatively appear in the record--that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326; *see also McDaniel v. Brown*, 558 U.S. 120, 132-133 (2010). The court must "accept the jury's resolution of the evidence as long as it is within the bounds of reason." *Grubbs v. Hannigan*, 982 F.2d 1483, 1487 (10th Cir. 1993) (citing *United States v. Edmondson*, 962 F.2d 1535, 1548 (10th Cir. 1992)). "To be sufficient, the evidence supporting the conviction must be substantial; that is, it must do more than raise a mere suspicion of guilt." *Beachum v. Tansy*, 903 F.2d 1321, 1332 (10th Cir.) (citing *United States v. Troutman*, 814 F.2d 1428, 1455 (10th Cir. 1987)), *cert. denied*, 498 U.S. 904 (1990).

> Sufficiency of the evidence is a mixed question of law and fact. We ask whether the facts are correct and whether the law was properly applied to the facts, which is why we apply both 28 U.S.C. § 2254(d)(1) and (d)(2) when reviewing sufficiency of the evidence on habeas.

*Maynard v. Boone*, 468 F.3d 665, 673 (10th Cir. 2006) (citations omitted*), cert. denied*, 549 U.S. 1285 (2007).

> In federal habeas proceedings, where a sufficiency challenge was resolved on the merits by the state courts, we have held that AEDPA "adds an additional degree of deference," and the question becomes whether "the OCCA's conclusion that the evidence was sufficient constituted an unreasonable application of the *Jackson* standard." *Diestel v. Hines,* 506 F.3d 1249, 1267 (10th Cir. 2007) (quoting *Patton v. Mullin,* 425 F.3d 788, 796 (10th Cir. 2005)) (internal quotation marks omitted); *see Coleman v. Johnson,* ―― U.S. ――, 132 S.Ct. 2060, 2062, 182 L.Ed.2d 978 (2012) (per curiam). We call this standard of review "deference squared." *Young v.*

> *Sirmons,* 486 F.3d 655, 666 n. 3 (10th Cir. 2007) (quoting *Torres v. Lytle,* 461 F.3d
> 1303, 1313 (10th Cir. 2006)) (internal quotation marks omitted).

*Hooks v. Workman*, 689 F.3d 1148, 1166 (10th Cir. 2012).

"Even if a state court resolves a claim in a summary fashion with little or no reasoning, [the habeas court] owe[s] deference to the state court's result." *Paine v. Massie*, 339 F.3d 1194, 1198 (10th Cir. 2003). A state court's summary disposition must be upheld unless a federal habeas court is persuaded, after conducting an independent review of the record and pertinent federal law, that the state court's result "unreasonably applies clearly established federal law." *Id.* (quoting *Aycox v. Lytle*, 196 F.3d 1174, 1178 (10th Cir. 1999)).

To determine whether there was sufficient evidence presented at trial to sustain Petitioner's conviction, the court first must look to Oklahoma law for the elements required for the crime. *Jackson*, 443 U.S. at 324 n.16; *see also Torres v. Mullin*, 317 F.3d 1145, 1152 (10th Cir.), *cert. denied*, 540 U.S. 1035 (2003). Oklahoma's first-degree child-abuse murder statute provides that:

> A person commits murder in the first degree when the death of a child results from
> the willful or malicious injuring, torturing, maiming or using of unreasonable force
> by said person . . . . It is sufficient for the crime of murder in the first degree that
> the person either willfully tortured or used unreasonable force upon the child or
> maliciously injured or maimed the child.

Okla. Stat. tit. 21, § 701.7(C).

In the case at hand, the jury received several instructions at trial, including the following:

"General Closing Charge–Presumption of Innocence"

> The defendant is presumed innocent of the crime charged, and the presumption
> continues unless, after consideration of all the evidence, you are convinced of his
> [sic] guilt beyond a reasonable doubt. The State has the burden of presenting the
> evidence that establishes guilt beyond a reasonable doubt.

> The defendant must be found not guilty unless the State produces evidence which
> convinces you beyond a reasonable doubt of each element of the crimes.

[Doc. 10-7 at 97].

"General Closing Charge–Credibility of Witnesses"

It is your responsibility to determine the credibility of each witness and the weight to be given the testimony of each witness. In determining such weight or credibility, you may properly consider: the interest, if any, which the witness may have in the result of the trial; the relation of the witness to the parties; the bias or prejudice of the witness, if any has been apparent; the candor, fairness, intelligence, and demeanor of the witness; the ability of the witness to remember and relate past occurrences, the means of observation, and the opportunity of knowing the matters about which the witness has testified. From all the facts and circumstances appearing in evidence and coming to your observation during the trial, aided by the knowledge which you each possess in common with other persons, you will reach your conclusions. You should not let sympathy, sentiment or prejudice enter into your deliberations, but should discharge your duties as jurors impartially, conscientiously, and faithfully under your oaths and return such verdict as the evidence warrants when measured by these instructions.

[Doc. 10-7 at 98-99].

"OUJI-CR 4-60 Homicide - Causation"

No person may be convicted of Murder in the First Degree unless her conduct caused the death of the person allegedly killed. A death is caused by the conduct if the conduct is a substantial factor in bringing about the death and the conduct is dangerous and threatens or destroys life.

[Doc. 10-7 at 101].

"OUJI-CR 4-65A Murder in the First Degree Involving Death of Child - Elements"

No person may be convicted of Murder in the First Degree unless the State has proved beyond a reasonable doubt each element of the crime. These elements are:

First, the death of a child under the age of eighteen;

Second, the death resulted from the willful or malicious using of unreasonable force;

Third, by the defendant.

*Id*.

"OUJI-CR 4-40D Definitions"

Malicious – The term imports a wish to vex, annoy or injure another person.

Unreasonable Force – More than that ordinarily used as a means of discipline.

Willful-Purposeful – "Willful" is a willingness to commit the act or omission referred to, but does not require any intent to violate the law or to acquire any advantage.

*Id*. at 102.

"OUJI-CR 9-4 Direct and Circumstantial Evidence - Weight"

The law makes no distinction between the weight to be given to either direct or circumstantial evidence. You would consider circumstantial evidence together with all the other evidence in the case in arriving at your verdict.

*Id*. at 104.

"OUJI-CR 9-5 Circumstantial Evidence"

The State relies in part for a conviction upon circumstantial evidence. In order to warrant conviction of a crime upon circumstantial evidence, each fact necessary to prove the guilt of the defendant must be established by the evidence beyond a reasonable doubt. All of the facts and circumstances, taken together, must establish to your satisfaction the guilt of the defendant beyond a reasonable doubt.

*Id*.

After reviewing the record, it is clear that the jury was properly instructed on the elements of first-degree child-abuse murder. This, in turn, leads to the question of whether *any* rational juror, after viewing the evidence in the light most favorable to the prosecution, could have found Petitioner guilty of first-degree child-abuse murder beyond a reasonable doubt.

In her habeas petition, Petitioner contends that the child "was restless and moving around as well as self-abusive all night as the [P]etitioner dozed off and on." [Doc. 1 at 6]. Petitioner allegedly "fell into exhausted sleep" around 5 a.m. and "did not get up for another six hours." *Id*. These assertions, according to Petitioner, prove she was asleep at the estimated time of A.H.'s

injury and death. She contends that the "circumstantial evidence cannot be sustained because the proof presented does not exclude every reasonable hypothesis except that of guilt," and that "anyone in the home could have been responsible for the death of the victim." *Id*. at 7.

Petitioner made similar statements during the investigation, asserting that the last time she was awakened by A.H. was around 5:00 a.m. when A.H. was talking and still not wanting to go to sleep. [Doc. 10-2 at 158-59]. Petitioner further claimed that she woke up at approximately 10:00 a.m. and went outside to smoke a cigarette. *Id*. at 160. When Petitioner went back inside, she found A.H. lying lifeless on the floor and she thought, "Oh, my God. What did I do?" *Id*. The statement prompted Investigator Baker to ask if she had hit or kicked the child. She stated that she didn't think so, and that she did not know, but that "it's possible" because she was a wild sleeper. [Doc. 10-2 at 160, 167].

The Tenth Circuit has repeatedly held that "the credibility of witnesses is a matter for the jury in each case to consider after proper instructions from the trial judge." *Haskins v. United States*, 433 F.2d 836, 839 (10th Cir. 1970). One of the instructions provided to the jury in this case clearly stated in part that "[i]t is your responsibility to determine the credibility of each witness and the weight to be given the testimony of each witness." [Doc. 10-7 at 98]. Petitioner did not testify at trial, but several witnesses testified about the statements made by Petitioner. Petitioner maintained throughout the investigation, and now in her habeas petition, that she was asleep when the child was injured.

Even so, other evidence supporting Petitioner's conviction was before the jury. The jury heard testimony from family members who were present in the home prior to A.H.'s death, as well as testimony describing the child's appearance before and after her death. A.H.'s sister was approximately four years old and did not testify, but Mr. Pacheco, F.P., Fl.P., and J.P. testified in no uncertain terms that they did not inflict the injuries to A.H. And of significant importance, Dr. Wiens testified that the injury to A.H.'s liver was consistent with a stomping, kicking or punching to the child's abdominal area, that the liver laceration was not likely caused by a person simply stepping on the child, and that it was not likely that the injury was caused by a toddler (i.e., A.H.'s sister).

In her habeas petition, Petitioner does not dispute that the injury to A.H.'s liver caused the child's death, but instead argues that she "was not the only person with access to the victim." [Doc. 1 at 6]. Nevertheless, Petitioner told Investigator Baker that the injuries to A.H. were not caused by Mr. Pacheco, or a stranger, and that Petitioner and Mr. Pacheco were the only ones in the room with A.H. during the night. [Doc. 10-2 at 168]. Petitioner's statements to the investigator are at odds with the assertions in her habeas petition.

Moreover, the evidence clearly established that, prior to her death, A.H. was on a pallet, on the floor, on Petitioner's side of the bed. Mr. Pacheco was sleeping on the opposite side of the bed near the closet. The child was talking and gagging herself throughout the night to stay awake. Petitioner, considered to be the child's primary caregiver and disciplinarian, admitted that she was awake with the child at different times throughout the night. Mr. Pacheco testified that, at one point, Mr. Pacheco heard Petitioner spank A.H. two or three times and heard A.H. say "owie." Mr. Pacheco believed that A.H. said "owie" in conjunction with Petitioner spanking her.

Numerous witnesses also testified about bruising on the child's body. Petitioner claims that "[a]fter elimination of the bruises self-inflicted and from resuscitation[,] the bruising that is left is much less than what the jury was led to believe." [Doc. 1 at 6]. Dr. Wiens testified, however, that she observed forty individual bruises or abrasions related to blunt force injury on A.H.'s body, some of which *could* be self-inflicted, and some of which *could* be perimortem/postmortem. [Doc. 10-3 at 89-90, 112].

The OCCA rejected Petitioner's claim on the merits, holding that "a rational juror could conclude, beyond any reasonable doubt, that Appellant inflicted the injuries and that they were not accidental in nature." [Doc. 9-5 at 3]. The OCCA, in other words, applied a standard that is practically indistinguishable from the standard in *Jackson*, and the OCCA's decision to deny relief on the claim is not unreasonable. "That the OCCA did not cite *Jackson* is of no moment; state courts need not refer to, or even be aware of, controlling Supreme Court cases, 'so long as neither the reasoning nor the result of the state-court decision contradicts them.'" *Matthews v. Workman*, 577 F.3d 1175, 1183 n.2 (10th Cir. 2009) (quoting *Early v. Packer*, 537 U.S. 3, 8 (2002)).

The OCCA ultimately concluded that "[t]he evidence, while largely circumstantial, is sufficient to support Appellant's conviction." [Doc. 9-5 at 3]. This court agrees. A rational juror could conclude beyond any reasonable doubt that A.H., a small child lying on a pallet near Petitioner's side of the bed, with her back supported by the floor, was quickly struck and fatally injured by Petitioner. This court need not consider whether the evidence presented at trial was sufficient to exclude every reasonable hypothesis other than guilt. *See Matthews v. Workman*, 577 F.3d at 1183 n.3.

The OCCA's determination of the claim was not contrary to, or an unreasonable application, of Supreme Court law, and its decision was not based on an unreasonable determination of the facts presented at trial. Ground I lacks merit and the court denies habeas relief.

**Ground II: Petitioner was deprived of the effective assistance of counsel in violation of the Sixth and Fourteenth Amendments because counsel failed to provide a qualified interpreter and failed to object to improper comments made by the State.**

In Ground II, Petitioner asserts two separate claims of ineffective assistance of counsel. First, Petitioner claims the OCCA "incorrectly determined that [c]ounsel was not ineffective when [counsel] failed to provide a qualified interpreter." [Doc. 1 at 8]. Petitioner alleges that the interpreter for Mr. Pacheco "repeatedly failed to understand what [he] was saying," that the consequence of counsel's failure to use a qualified interpreter resulted in a violation of the Confrontation Clause, and that counsel failed to provide the best possible defense available. *Id.* Petitioner points out that Mr. Pacheco had spoken with investigators in English but later caused confusion when testifying in Spanish and English at trial when using the uncertified interpreter. *Id.* The court is also reminded that Mr. Pacheco was "in the immediate proximity to the victim at the time of death and a likely suspect." *Id.* Petitioner does not explain how Mr. Pacheco's testimony would have been different had counsel used a certified courtroom interpreter, nor does she identify other evidence which might have implicated Appellant's husband as an alternative suspect in the crime. Petitioner is nevertheless convinced that a certified courtroom interpreter

would have made a difference for her at trial, arguing that the non-approved interpreter's "problem with translations" prevented her attorney from understanding Mr. Pacheco's answers to the prosecutor's questions, and prevented her attorney from effectively cross-examining Mr. Pacheco. *Id*. at 9.

Petitioner's second claim of ineffective assistance of counsel is based on counsel's failure to object to improper comments made by the State. *Id*. In particular, Petitioner claims the State "engaged in emotional provocation of the jury to ensure a conviction," and "made repeated statements that manipulated the evidence rather than interpreted the evidence." *Id*. Petitioner alleges that defense counsel's failure to object to the improper comments, along with the alleged failure of the uncertified interpreter, "created the atmosphere of a certain conviction of the Petitioner." *Id*.

In response to Petitioner's first claim of ineffective assistance of counsel, Respondent contends as follows:

> As shown, Petitioner has not, and cannot, prove that defense counsel's failure to provide a qualified interpreter constituted deficient performance, or show that there is a reasonable probability that but for counsel's failure to provide a different interpreter, the outcome of the trial would have been different. Therefore, as the underlying claim is meritless and because the Oklahoma Court of Criminal Appeals' determination under the *Strickland* standard was reasonable, Petitioner's subclaim of ineffective assistance of trial counsel should be denied.

[Doc. 9 at 25-26]. As to the second ineffective assistance claim for failure to object to the prosecutor's comments, Respondent sets forth the following argument:

> The Tenth Circuit holds, "'[A] prosecutor may comment on and draw reasonable inferences from evidence presented at trial.'" *Bland v. Sirmons,* 459 F.3d 999, 1028 (10th Cir. 2006) (quoting *Thornburg v. Mullin*, 422 F.3d 1113, 1131 (10th Cir. 2005)). As the underlying prosecutorial error claim is meritless, counsel cannot be found ineffective in failing to object to the complained of statement. *See Hanson v. Sherrod*, 797 F.3d 810, 841 (10th Cir. 2015) ("Because there was no prosecutorial misconduct, Hanson was not denied his right to effective assistance of counsel when counsel did not object to the comments."). Petitioner has not, and cannot, prove that defense counsel's failure to object to the complained of statement was deficient performance, or show that there is a reasonable probability that but for counsel's failure to object to the complained of statement the outcome of the

trial would have been different. This subclaim of ineffective assistance of counsel is meritless and should be denied.

*Id.* at 29. Ultimately, Respondent urges the court to defer to the decision of the OCCA and find the Court's application of *Strickland* was not contrary to, or an unreasonable application of, federal law as determined by the Supreme Court. *Id.* at 29-30.

The OCCA analyzed and rejected Petitioner's ineffective assistance of counsel claims as follows:

> The State called Appellant's husband as a witness to offer his observations in the hours before the child's death. The witness's native language is Spanish. In Proposition II, Appellant complains because the trial court employed an unapproved person to interpret the witness's testimony. Rules regarding the certification of courtroom interpreters are found at 20 O.S. §§ 1701 *et seq.* Because Appellant had no objection to the interpreter's involvement below, we review only for plain error. Appellant must show an actual deviation from a legal rule which is plain and obvious, and which affected her substantial rights, *i.e.*, the outcome of the proceeding. *Hogan v. State*, 2006 OK CR 19, ¶ 38, 139 P.3d 907, 923. There is no evidence that the interpreter used in this case had met the requirements of 20 O.S. §§ 1701 *et seq.* Yet we also find nothing in the record to suggest that the interpreter provided inaccurate translation of the witness's testimony, or that the translation prejudiced Appellant. In fact, the State responds by showing that the witness's trial testimony (as translated) was substantially the same as his testimony at preliminary hearing, where he spoke without the aid of an interpreter. There is no plain error here, and Proposition II is denied.
>
> \*     \*     \*
>
> In Proposition III, Appellant claims the prosecutor committed error by misstating the law, misstating the facts, and evoking sympathy for the victim. Because she did not object to these comments below, we review only for plain error. . . . Appellant shows no prejudice from the prosecutor's references to the victim as "little [A.H.]" or "little baby [A.H.]"; the evidence supports the jury's verdict, and the sentence it recommended was the most lenient available. *Id.* Finally, the prosecutor's closing comments suggesting how Appellant might have inflicted the child's injuries were based on a reasonable interpretation of the evidence, and were therefore proper. *Hooper v. State*, 1997 OK CR 64, ¶¶ 52-54, 947 P.2d 1090, 1110. Because we find no plain error in any of the prosecutor's comments, Proposition III is denied.
>
> \*     \*     \*

In Proposition V, Appellant complains that she was denied her right to the effective assistance of trial counsel. She faults trial counsel for (1) not objecting to the prosecutor's comments raised in Proposition III; (2) not objecting to the use of an uncertified courtroom interpreter as discussed in Proposition II; and (3) not presenting certain evidence which might have implicated Appellant's husband as an alternative suspect in the crime. In connection with these last two claims, Appellant has filed a Notice of Extra-Record Evidence and Application for Evidentiary Hearing, pursuant to Rule 3.11, *Rules of the Oklahoma Court of Criminal Appeals*, 22 O.S., Ch. 18, App. (2016). To prevail, Appellant must show trial counsel provided professionally unreasonable assistance, and a reasonable probability of resulting prejudice. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *Hanson v. State*, 2009 OK CR 13, ¶ 35, 206 P.3d 1020, 1031.

As to the first claim, none of the prosecutor's comments complained of in Proposition III were found to be improper, and any objections to them would have been properly overruled. Trial counsel cannot be ineffective for failing to make meritless objections. *Eizember v. State*, 2007 OK CR 29, ¶ 155, 164 P.3d 208, 244. As to the last two claims, the extra-record materials Appellant offers simply do not suggest how she was prejudiced by the use of a non-approved courtroom interpreter, nor do they show a reasonable probability that, if trial counsel had utilized known information in a different manner, a jury would have suspected her husband as the real perpetrator of the crime and acquitted her of the charge. *Simpson v. State*, 2010 OK CR 6, ¶ 53, 230 P.3d 888, 905-06. Proposition V is denied.

*Pacheco*, slip op. at 3-6.

The Sixth Amendment guarantees criminal defendants the effective assistance of counsel. To prevail on her claim of ineffective assistance of counsel, the defendant must prove deficient performance and prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To prove deficiency, the defendant must overcome the strong presumption that counsel's conduct fell within the wide range of professional conduct, including trial strategy. *Id*. at 689. To prove prejudice, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. In *Harrington v. Richter*, 562 U.S. 86 (2011), the Supreme Court further explained:

Surmounting *Strickland's* high bar is never an easy task. An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve. Even under *de novo*

review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence. The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.

*See Richter*, 562 U.S. at 105 (internal citations and quotation marks omitted).

More recently, in *Johnson v. Carpenter*, 918 F.3d 895 (10th Cir. 2019), the Tenth Circuit Court of Appeals provided the following guidance regarding the application of *Strickland* in habeas corpus proceedings:

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs this case. AEDPA "circumscribes our review of federal habeas claims that were adjudicated on the merits in state-court proceedings." *Hooks v. Workman*, 689 F.3d 1148, 1163 (10th Cir. 2012). Under AEDPA, a federal court may grant relief to a state prisoner only if he has established

that the state court's adjudication of the claim on the merits (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law"; or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

*Littlejohn v. Trammell*, 704 F.3d 817, 824 (10th Cir. 2013) (quoting 28 U.S.C. § 2254(d)).

This standard is "highly deferential [to] state-court rulings" and demands that those rulings "be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam). "If this standard is difficult to meet, that is because it was meant to be. ... It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents. It goes no further." *Harrington v. Richter*, 562 U.S. 86, 102, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011) (citations omitted).

The burden on the petitioner is particularly difficult when he is pursuing an ineffective assistance of counsel claim. This is because the state court must unreasonably apply *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). A *Strickland* claim will be sustained only when (1) "counsel made errors so serious that counsel was not functioning as 'counsel' " and (2) "the deficient performance prejudiced the defense." *Id.* at 687, 104 S.Ct. 2052. Thus, "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential,

and when the two apply in tandem, review is doubly so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial." *Richter*, 562 U.S. at 105, 131 S.Ct. 770 (citations omitted).

Federal courts, therefore, "must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* Our only task, then, is to determine whether reasonable jurists could agree with the OCCA that [petitioner's] trial and appellate counsels acted reasonably. *See id.* AEDPA allows us to go no further.

*See Johnson v. Carpenter*, 918 F.3d at 899-900.

Petitioner first argues in Ground II that counsel was ineffective for failing to utilize a qualified interpreter to translate Mr. Pacheco's testimony during trial. In essence, Petitioner complains that a language barrier prevented her attorney from understanding Mr. Pacheco's testimony, and that her attorney was unable to effectively cross-examine Mr. Pacheco, resulting in an unfair trial. In support of her claim, Petitioner directs the court's attention to affidavits from defense counsel and a juror, which vaguely asserts some confusion in the testimony between Mr. Pacheco and Ms. Molly Peterson, the non-approved courtroom interpreter. Clearly, defense counsel was dissatisfied with the interpreter during Petitioner's trial, raising doubts as to Ms. Peterson's qualifications and training, but counsel also acknowledged that she had previously used Ms. Peterson to assist her in communicating with a Spanish-speaking client. [Doc. 9-2 at 14]. Counsel explained that Spanish, rather than English, was Mr. Pacheco's first language, and based upon her past experience with Ms. Peterson, counsel did not object to the State using her as an interpreter for Mr. Pacheco. *Id.* Similarly, in a separate affidavit, Juror Kathleen Burke reported "some confusion between Mr. Pacheco and the interpreter," claiming that Ms. Peterson apparently relied upon her phone at one point to assist with the translation of Petitioner's testimony. *Id.* at 16.

The OCCA reviewed the extra-record materials in support of Petitioner's claim, including the affidavits from defense counsel and the juror. In its summary opinion, the OCCA denied Petitioner's request for an evidentiary hearing, opining that "the extra-record materials Appellant offers simply do not suggest how she was prejudiced by the use of a non-approved courtroom

interpreter . . . ."[2]   [Doc. 9-5 at 6].   Indeed, Petitioner does not explain how Mr. Pacheco's testimony, if translated by a certified courtroom interpreter, would have changed the outcome of the trial.

Mr. Pacheco's testimony during the preliminary hearing, which was provided in English, closely matched his translated testimony at trial.   Mr. Pacheco consistently testified during the preliminary hearing and jury trial that he did not cause the injuries to the child, and that he heard Petitioner spank A.H. and the child said "owie."   [Doc. 9-6 at 6-9, 13-14, 16-19; Doc. 10-3 at 20-23, 25, 36].   Mr. Pacheco also claimed he was awakened at one point from the light of the television, but was otherwise asleep throughout the night.   [Doc. 9-6 at 13, 17; Doc. 10-3 at 20, 32].   Petitioner must also keep in mind that her prior statements actually bolstered Mr. Pacheco's testimony at the preliminary hearing and jury trial.   Mr. Pacheco clearly testified that he did not harm A.H., which was consistent with Petitioner's statements during the investigation.   Petitioner told authorities that her husband did not injure the child, and that Mr. Pacheco and Petitioner were the only people in the room with A.H.   Petitioner's statements, if taken as true, would effectively undermine other evidence which might have implicated Mr. Pacheco as an alternative suspect.

As explained by the OCCA, Petitioner fails to show how she was prejudiced by the use of a non-approved courtroom interpreter.   Quite simply, Petitioner's claim fails the prejudice prong of *Strickland*.   "We need not analyze both the performance and prejudice prongs of the *Strickland* test if defendant fails to make a sufficient showing of one."   *United States v. Hollis*, 552 F.3d 1191, 1194 (10th Cir. 2009) (internal quotation marks omitted).

Petitioner next argues in Ground II that counsel was ineffective for failing to object to certain comments from the prosecutor at trial.   The prosecutor made the following comments:

> Ladies and gentlemen, the State submits to you that the evidence is not that that baby went to sleep around 5:00 in the morning.   The evidence the State has, and we believe that you can consider, is that's [sic] when the Defendant, 5:00, 5:30 in the morning, stomped that baby.   And that baby hurt.   And then she reaches down –

---

[2]   "[A]ny denial of a request for an evidentiary hearing on the issue of ineffective assistance of counsel filed pursuant to OCCA Rule 3.11 . . . operates as an adjudication on the merits of the *Strickland* claim and is therefore entitled to deference under § 2254(d)(1)."   *Lott v. Trammell*, 705 F.3d 1167, 1213 (10th Cir. 2013).

probably doesn't think that she's just killed this baby. She reaches down, and she grabs that mouth to shut her up. And maybe that's where these bruises are from right here on that face. Nobody had observed them before that night, but they're on that little dead body in that ambulance.

[Doc. 10-4 at 76].

The OCCA concluded that the prosecutorial comments were based on a reasonable interpretation of the evidence and were not improper. Petitioner disagrees, claiming she was "asleep at the time, and that there was no testimony or evidence to show how the injury happened to the victim or who did it." [Doc. 1 at 9]. Petitioner further contends that the bruises on the child's face were caused by first responders performing CPR.

The OCCA's conclusion was not unreasonable. It is well-established that "[a] prosecutor may comment on and draw reasonable inferences from evidence presented at trial." *See Thornburg v. Mullin*, 422 F.3d 1113, 1131 (10th Cir. 2005). Here, the evidence provided support for the prosecutorial comments. As explained in Ground I above, it is not unreasonable to conclude that Petitioner stomped A.H while she was lying on the pallet on the floor on Petitioner's side of the bed. Nor is it unreasonable to conclude that, after stomping the child, Petitioner grabbed her mouth to shut her up, *maybe* causing the bruising on her face. Dr. Wiens testified that there were forty individual bruises or abrasions related to blunt force injury on A.H.'s body, some of which could be self-inflicted, and some of which could be perimortem/postmortem. [Doc. 10-3 at 89-90, 112]. Counsel's failure to object to the comments did not constitute deficient performance under *Strickland*, and there was no prejudice because any objection to the comments would have been properly overruled.

After careful review, the court finds the record in this case clearly establishes that trial counsel's performance satisfied the requirements of *Strickland*. The court further finds the OCCA's decision on the claims was not contrary to, or an unreasonable application of, Supreme Court precedent, and the OCCA's decision was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). Ground II is denied.

**Certificate of Appealability**

The court further finds Petitioner has failed to make a "substantial showing of the denial of a constitutional right," as required by 28 U.S.C. § 2253(c)(2). In addition, she has not "demonstrate[d] that reasonable jurists would find [this] court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Therefore, a certificate of appealability shall be denied.

ACCORDINGLY, Petitioner's petition for a writ of habeas corpus [Doc. 1] is DENIED, and a certificate of appealability is DENIED.

It is so ordered this 16th day of January, 2020.

_____
THE HONORABLE RONALD A. WHITE
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF OKLAHOMA